UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

PATRICIA J. CURTO,

                                                              **REPORT AND**
                                                              **RECOMMENDATION**
                      Plaintiff,

v.

                                                              18-cv-00695-JLS-JJM

ERIE COUNTY WATER AUTHORITY,

                    Defendant.
_____

        Before the court is a motion by defendant Erie County Water Authority ("ECWA") for summary judgment pursuant to Fed. R. Civ. P. ("Rule") 56 [113].[1] Familiarity with the relevant factual and procedural history is presumed, and will be repeated only as necessary for resolution of this motion.

        Plaintiff Patricia Curto seeks recovery under various theories, arising from the ECWA's termination of her water service on March 21, 2017. *See* Amended Complaint [30]. On April 24, 2020 the ECWA moved pursuant to Rule 12(b)(6) seeking dismissal of Ms. Curto's Amended Complaint for failure to state a claim upon which relief can be granted [33]. By Report and Recommendation dated March 31, 2021 ("R&R"), Magistrate Judge Jonathan W. Feldman recommended dismissal of every claim alleged by Ms. Curto, "except for: (1) the procedural due process claim; (2) the takings claim; and (3) a state-law trespass claim". [47] at 37. That recommendation was adopted by District Judge John L. Sinatra, Jr. in a Decision and Order dated July 8, 2021 [58].

---

[1]     Bracketed references are to CM/ECF docket entries, and page refences are to CM/ECF pagination.

The ECWA now moves for summary judgment dismissing Ms. Curto's three remaining claims. Having reviewed the parties' submissions [113, 115, 121, 122, 125, 126, 132] and heard oral argument on October 26, 2022 [133], for the following reasons I recommend that the motion be granted in part and denied in part.

## DISCUSSION

### A. Procedural Due Process

Ms. Curto alleges that the ECWA improperly terminated her water service for failing to respond to a March 1, 2017 card left at her home. Amended Complaint [30] at 2-4, 7. Judge Feldman concluded that these allegations "can fairly be read to include a procedural due process claim". R&R [47] at 13.

The ECWA argues that Ms. Curto's procedural due process claim should be dismissed because she "was offered sufficient process prior to and after termination of her water service". ECWA's Memorandum of Law [113-4] at 12. However, although they may affect the extent of Ms. Curto's damages, events occurring *after* the termination cannot bar this claim altogether, because "a necessary component of due process is a *pre*-deprivation opportunity to be heard." R&R [47] at 16 (emphasis added).

The ECWA argues that "over the course of approximately two and a half years, Plaintiff was notified of a need to change her water meter on at least 10 occasions . . . . The notices also expressly warned Plaintiff that a refusal to allow replacement of the meter would result in termination of water service". ECWA's Memorandum of Law [113-4] at 13. However, the ECWA never acted on those notices. The notice which it *did* act on, leading to the

termination of Ms. Curto's water service, was the March 1, 2017 tag ([113-23] at 3) which its Meter Service Worker, Aaron Otoka, left on her door. *See* Otoka Declaration [113-5], ¶3.

Although Otoka prepared the tag "to inform her of the Authority's need to service her property and further indicating that [she] must call the Authority and that '[f]ailure to hear from you in 10 days will result in termination of water service'", he "inadvertently marked the 'application for service' checkbox". Id., ¶¶3, 4.

Judge Feldman pointed out several deficiencies in this notice:

> The notice . . . was vague and unclear. It indicates that there was an 'application for service' on March 1, but it does not specifically reference Curto or her address . . . . Standing alone, the phrase 'application for service' has no obvious meaning. It could mean, as Curto inferred, that the Water Authority had received an application to provide water service at the Hazel Court property, or it could mean, as the Water Authority contends, that the Water Authority was intending to provide maintenance services at the property . . . .
>
> Viewing the notice as a whole, it can be said to convey some information . . . but a reader would likely be left with more questions than answers. The notice does not indicate what kind of service is being performed, what obligations such service imposes on the homeowner, or, most importantly, why the failure to call a number results in the termination of service, and what remedies the homeowner has to challenge the proposed service or the potential termination.
>
> Thus, it could be reasonably argued that the Water Authority left a threat of termination on Curto's doorstep and provided little context by which Curto could assess what was happening and why . . . . Under the circumstances, the Court cannot fault Curto, a layperson, for her interpretation of the notice. She believed the notice related to someone 'applying for' water service, and, because she already had water service, the notice did not relate to her."

R&R [47] at 17-19.

Although Judge Feldman cautioned that his recommendation was "necessarily tentative" and was "without prejudice to either side developing facts and marshalling additional legal authority in support of summary judgment" (id. at 21-22), the evidence submitted since then does not entitle the ECWA to summary judgment dismissing this claim.

Ms. Curto argues that "[a]ssuming arguendo there was prior to 3/1/2017 requests, they would have been replaced by the 3/1/2017 'notice'." Curto Affidavit [121] at 33. She points out that the notice "did NOT inform me of a need to service my property and affirmatively excluded a need to service ECWA property . . . and stated the one and only reason was an APPLICATION for water service (by a new customer). The APPLICATION cited was not submitted by me (my application was submitted and approved over a decade before). No where on the notice does Particia J Curto appear. The notice does not indicate that I must call the Authority. The person that the notice indicated must call is the person who submitted the application. I was previously informed by the ECWA (during a phone conversation) that they could not talk to me about another customer/account." Id. at 31-32.

For purposes of this motion, I must credit Ms. Curto's assertions. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). My view of her likelihood of success is irrelevant to that determination. See American International Group, Inc. v. London American International Corp., 664 F.2d 348, 351 (2d Cir. 1981) ("summary judgment is improper when the court merely believes that the opposing party is unlikely to prevail on the merits after trial"). Therefore, I recommend that thew motion be denied as to this claim.

B.     Trespass

As recognized by Judge Feldman, Ms. Curto's Amended Complaint [30] is limited to alleged trespasses that occurred on March 2 and 21, 2017, and during the week of September 16, 2018. R&R [47] at 27 (*citing* Amended Complaint [30], ¶¶4, 7).  Therefore, to the extent that she points to an unspecified number of additional alleged trespasses by ECWA employees that occurred "over weeks/months/years . . . to determine [if her] service continued to be terminated at the curb box" (Curto Affidavit [132] at 5), those entries are not at issue in this case.[2]

The ECWA argues that the three entries onto Ms. Curto's property were privileged - *i.e.*, with her contractual consent and authorized by law. ECWA's Memorandum of Law [113-4] at 22-25.  Judge Feldman explained that "an entry pursuant to a privilege must be 'for the purpose for which the privilege is given' and only to the extent 'reasonably necessary . . . to perform the duty or exercise the authority'".  R&R [47] at 28 (*quoting* Restatement (Second) of Torts § 211 cmts. c, f (1965)).

By initiating service in 2006 with the ECWA, Ms. Curto agreed to be bound by the terms of its Tariff, which states that "[t]he customer shall grant identified [ECWA] employees  . . . access to the premises at reasonable times for purposes of installing, reading, inspecting, or repairing meters". [113-3], §2.39.[3] *See also* ECWA's Application for Water

---

[2]     Curto raises several other issues in response to the ECWA's motion that also are not at issue in this case, including alleged overbilling by the ECWA (Curto Affidavit [121] at 6, 25), and the ECWA's failure to follow its own COVID protocol for the restoration of water service. Id. at 6; Curto's Sur-reply Affidavit [132] at 10.

[3]     The ECWA's motion relies on the Tariff that became effective January 1, 2018, *after* the March 2017 entries onto Curto's property.  However, in reply, the ECWA submitted the Tariffs in effect when she initiated service [126-5] and when her water service was terminated [126-6].  Both contained identical provisions.  See [126-5], §2.40; [126-6], §2.39.

Service dated April 20, 2006 [113-11]. The New York Public Authorities Law also gives the ECWA the right "enter on any lands . . . and premises for the purpose of . . . examinations". New York Public Authorities Law §1054(13).

    **1.**    **March 2, 2017**

According to Otoka's Declaration [113-5], he first entered Ms. Curto's property on March 2, 2017, "in an attempt to speak with [Curto] about changing her water meter". Id., ¶6. When Ms. Curto failed to answer the front door, he headed to the "ARB box", an electronic reader port on the exterior of the home, and took a meter reading before placing the notice on the front door and "immediately" leaving the property. Id., ¶¶8-11; D'Amico Affidavit [113-7], ¶23. At least some portion of this is placed into doubt by the ECWA's own records, which indicate that the meter was read a day earlier. Meter & Service Order [113-23] at 2.[4]

Ms. Curto also offers a different version of events. She states that Otoka removed a barricade at the end of her driveway to gain entry to her property and proceeded past "No Trespassing" signs. Curto Affidavit [121] at 14, response to Claim in ¶8. According to Ms. Curto, "[a]fter walking the width of my front lawn (from east to west), [Otoka] turned around and walked back to the driveway, down the driveway moved the barrack [*sic*], exited the property, and walked to my neighbor who was in his driveway and spoke to him about my account (violating my privacy), he reentered my property (via the lawn in the front middle of property), after some time [he] left the property and drove off in his vehicle". Id. at 15, response to Claim in ¶10. See also Curto Affidavit [132] at 8 (Otoka "hung a termination form . . . then proceeded to walk across the lawn to within 5-6 feet of meter reading port on side of house,

---

[4]    The notice Otoka left on Curto's door was also dated March 1, 2017 ([113-23] at 3), but Otoka states that he prepared it on that date. See Otoka Declaration [113-5], ¶3.

urinate in the bushes, walk across the property and left the property to talk to the neighbor . . . and then entered my private posted property again a second time . . . before leaving"). Ms. Curto agrees that Otoka walked to the side of the house where the ARB is located, but states that she "did not observe him reading it". Id. She also disputes that he "immediately" left her property after placing the notice on her door knob. Id. At oral argument, Ms. Curto acknowledged that she was not home at the time, but later watched a surveillance video that captured these events. That video has not been produced either to the ECWA in discovery or to the court in connection with the motion.

Nothing in the record rebuts the fact that Otoka entered Ms. Curto's property in an attempt to change her meter, which would render the entry privileged for that purpose. However, Ms. Curto disputes that Otoka was identified as an ECWA employee. *See* Curto Affidavit [121] at 14, response to Claim in ¶8 ("I did not know who he was (could not see his vehicle nor any type of identification on him"); Tariff effective January 1, 2017 [126-6] at §2.39 ("[t]he customer shall grant *identified* [ECWA] employees . . . access to the premises" (emphasis added)).

Giving Ms. Curto the benefit of every favorable inference, there is a triable issue of fact as to whether Otoka acted beyond the scope of that privilege by remaining on her property after unsuccessfully attempting to speak to her about replacing the meter. While Otoka purports to have stayed on the property to read Ms. Curto's meter, the ECWA's own records show that the meter reading occurred a day earlier. *See* Meter & Service Order [113-24] at 2.

      **2.**      **March 21, 2017**

According to Otoka, he returned on March 21, 2017 "to try and obtain [Ms. Curto's] consent to change the water meter or otherwise terminate the water service". Otoka Declaration [113-5], ¶12. When his knocks on the front door went unanswered, he took another meter reading from the ARB box on the exterior of Ms. Curto's residence and terminated the water service. Id., ¶¶14-16. At some point, while Otoka was there, a neighbor inquired about what he was doing and they spoke. Id., ¶17. A Meter & Service Order dated March 21, 2017 corroborates that Curto's meter was read that day. [113-24] at 2.

Ms. Curto disputes whether Otoka knocked on her door, read the meter, or spoke to her neighbor. *See* Curto Affidavit [121] at 16, responses to Claims ¶¶14-17. Instead, she states that "[h]e exited his vehicle, entered my property mid front lawn, used a metal detector, upon finding the shut off valve, terminated service and left/drove away". Id. at response to Claim ¶14.[5] At oral argument, she stated that she was home at this time and videotaped these events. However, that video has not been produced in discovery or to the court.

Crediting Ms. Curto's version of events (as I must for purposes of this motion), Otoka's entry onto her property was limited to locating the shut off valve and terminating service. However, the Tariff provision that the ECWA relies upon only grants access "for purposes of installing, reading, inspecting, or repairing meters" (Tariff effective January 1, 2017 [126-6], §2.39), and the Public Authorities Law only permits entries onto property for the purpose of conducting "examinations". New York Public Authorities Law §1054(13). The termination of water service to a property is none of those things.

---

[5]    As the ECWA notes, this diverges from the description of the entry alleged by Ms. Curto in her Amended Complaint. ECWA's Reply Memorandum of Law [126] at 18.

The ECWA also points to the Public Authorities Law, which affords it the ability to "do all things necessary or convenient to carry out the powers expressly given in this title". NY Public Authorities Law §1054(18). It contends that "[i]nspecting, servicing, upgrading, and/or maintaining components of the water supply system is certainly a 'necessary' act to carry out its power to develop and maintain the system". ECWA's Memorandum of Law [113-4] at 24. Again, termination of water service is not one of those things. Therefore, the ECWA has not established its entitlement to summary judgment.

### 3. Week of September 16, 2018

Both parties appear to agree that the ECWA's entry onto her property occurred on September 18, 2018. Steven D'Amico, the ECWA's Business Office Manager, states that "on September 18, 2018, an employee of the Authority, entered onto [Ms. Curto's] property for the purposes of inspecting its equipment and determining whether the water service had been illegally turned back on". D'Amico Affidavit [113-7], ¶64; ECWA's Statement of Material Facts ([113-1], ¶¶94, 97). D'Amico states that the unidentified employee's entry "was limited to . . . going to the curb box shut off valve located near the street at the front of the property" to "confirm that water service to the property remained shut off". Id., ¶65.

Ms. Curto paints a different picture. She states that the purpose of the September 18, 2018 entry "was to determine if [the] house was vacant. The ECWA employee walked past several 'POST [sic] NO TRESPASSING' signs, move[d] my driveway barrack [sic], walked to the blue painted cover of the shut off valve but did not remove the cover and check to see [the] valve was closed, he walked to the side of my house past the location where Mr. Otoka had torn off the external port meter reader . . . then turned around again walking past location of where

Mr. Otoka had torn off the external port meter reader and across the front of my house to the front porch step and finally exited the property". Curto Affidavit [132] at 3.

The ECWA argues that since Ms. Curto does not live at the property, she "provides no basis to establish her personal knowledge of what occurred at her property on September 18, 2017". ECWA's Reply Memorandum of Law [126] at 19. The same can be said of D'Amico, who lacked personal knowledge of what the unidentified ECWA employee did on her property. In any event, giving Ms. Curto every favorable inference on this motion (as I must), I will assume that, similar to the March 2017 entries, she either observed these events in real time or at a later date via a surveillance video.

Based on D'Amico's lack of personal knowledge, his Affidavit fails to meet the ECWA's burden of establishing that no trespass occurred on March 18, 2018, but even if it did satisfy the ECWA's burden, Ms. Curto's version of events, whereby the ECWA's entry onto her property went well beyond an inspection of the curb box shut off valve to confirm that water service remained terminated, is sufficient to raise a triable issue of fact as to whether a trespass occurred.

**C.    Takings**

The court has not previously "found there was a taking", as Ms. Curto argues (Sur-Reply Memorandum of Law [132] at 24), but rather only that a takings claim has been sufficiently alleged. See Vega v. Hempstead Union Free School District, 801 F.3d 72, 87 (2d Cir. 2015) ("[o]n a motion to dismiss, the question is not whether a plaintiff is likely to prevail, but whether . . . plaintiffs allege enough to 'nudge[ ] their claims across the line from conceivable to plausible'", quoting Bell Atlantic Corporation v. Twombly, 550 U.S. 544, 570 (2007)).

"The Takings Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment, prohibits the government from taking private property for public use without just compensation." Palazzolo v. Rhode Island, 533 U.S. 606, 617 (2001). "The law recognizes two species of takings: physical takings and regulatory takings." Buffalo Teachers Federation v. Tobe, 464 F.3d 362, 374 (2d Cir. 2006). I will address both.[6]

1.  **Physical Takings**

Physical takings "occur when the government physically takes possession of an interest in property for some public purpose". Buffalo Teachers Federation, 464 F.3d at 374. A "taking is fairly obvious in physical takings cases: for example, the government might occupy or take over a leasehold interest for its own purposes . . . or the government might take over a part of a rooftop of an apartment building so that cable access may be brought to residences within". Id.

The ECWA argues that since nothing was taken from Ms. Curto for a public use or purpose, this claim fails. ECWA's Memorandum of Law [113-4] at 17. I agree, and recommend that this portion of the claim be dismissed. However, I disagree with the ECWA

---

[6]  Since Ms. Curto failed to initially respond to the ECWA's arguments seeking dismissal of her takings cause of action, it argues that that portion of its motion should be granted as unopposed. ECWA's Reply Memorandum of Law [126] at 16. In her sur-reply, she appears to attribute her nonfeasance to the fact that she did not receive a complete set of motion papers. See Sur-Reply Memorandum of Law [132] at 16; Sur-Reply Affidavit [132] at 12. Yet, in her sur-reply she responds to the taking argument and cites to the pages of the ECWA's Memorandum of Law addressing that argument (see Curto's Sur-Reply Memorandum of Law [132] at 24-25), suggesting that her copy of the motion was *not* missing the takings section as she appears to contend. In any event, given Ms. Curto's *pro se* status, I will consider her belated opposition. See Jackson v. Federal Express, 766 F.3d 189, 197–98 (2d Cir. 2014) ("[w]here a partial response to a motion is made" by a *pro se* litigant, "the district court should examine every claim or defense with a view to determining whether summary judgment is legally and factually appropriate").

(*see* id.) that this is also fatal to Ms. Curto's regulatory takings claim. *See* Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency, 535 U.S. 302, 330 (2002) ("neither a physical appropriation nor a public use has ever been a necessary component of a 'regulatory taking'"); Muhammad v. City of Moreno Valley Code Enforcement, 2022 WL 837421, *5 (C.D. Cal. 2022) (same).

 2. **Regulatory Takings**

"The gravamen of a regulatory taking claim is that the state regulation goes too far and in essence 'effects a taking.'" Buffalo Teachers Federation, 464 F.3d at 374. Regulatory takings fall into two categories: categorical and non-categorical. *See* Sherman v. Town of Chester, 752 F.3d 554, 564 (2d Cir. 2014). A categorical taking occurs in "the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted." Tahoe-Sierra Preservation Council, Inc., 535 U.S. at 330 (emphasis in original). This is not such a circumstance. *See* South Nassau Building Corp. v. Town Board of Town of Hempstead, 2022 WL 3446317, *10 (E.D.N.Y. 2022) (finding it to not be a categorical taking where "the property can still be sold to be used as a residence").

 Therefore, I will analyze Ms. Curto's claim as a non-categorical taking, which results from "[a]nything less than a complete elimination of value, or a total loss". Tahoe-Sierra Preservation Council, Inc., 535 U.S. at 330. *See also* Lebanon Valley Auto Racing Corp. v. Cuomo, 478 F. Supp. 3d 389, 400 (N.D.N.Y. 2020) ("[i]f a regulation results in less than a complete elimination of value, it is . . . a non-categorical taking"). To determine whether a non-categorical regulatory taking has occurred, three factors are weighed: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with

distinct investment-backed expectations; and (3) the character of the governmental action." Murr v. Wisconsin, __U.S.___, 198 L. Ed. 2d 497, 137 S. Ct. 1933, 1943 (2017).

Ms. Curto, who bears a "heavy burden" to establish a regulatory taking, Buffalo Teachers Federation, 464 F.3d at 375, argues that the ECWA's illegal termination of her water service has limited her ability to utilize the property for its intended purpose - residential occupancy. Curto's Sur-Reply Memorandum of Law [132] at 25. However, for the reasons set forth by the ECWA ([113-4] at 18-22), none of the factors weigh in favor of finding a regulatory taking has occurred.

Any economic impact from the termination of Ms. Curto's water service was temporary and within her control to remedy. See Buffalo Teachers Federation, 464 F.3d at 375 ("the severity of the economic impact of the [wage] freeze . . . [is] relatively small", where it is "temporary and operates only during a control period"); Remauro v. Adams, 2022 WL 1525482, *6 (E.D.N.Y. 2022) (since "the condemnation . . . is temporary . . . applying only until 'such time as [Plaintiffs] have an [e]ngineering report completed detailing all deficiencies at the [Apartment Building] and required repairs to bring the structure[ ] into compliance with the NY State Building Code"). Melody Gil, an ECWA employee, states that she told Ms. Curto on March 22, 2017, the day following the termination of her water service, that her water could be "immediately" restored following a "5 minute[]" meter change, but she refused. Gil Affidavit [113-6], ¶¶10-13.

While Ms. Curto disputes what Gil told her (*see* Curto Affidavit [121] at 23, responses to Claims ¶¶10, 11), she does not deny that she refused to have her meter changed. Id. at response to Claim ¶12. At the April 21, 2022 oral argument [107] the ECWA reiterated its

willingness to reinstate Ms. Curto's water service if she permitted it to change her meter, but she again refused.

        The second factor, whose purpose is "to limit recovery to owners who could demonstrate that they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime", also weighs against Ms. Curto. Allen v. Cuomo, 100 F.3d 253, 262 (2d Cir. 1996). See also Meriden Trust & Safe Deposit Co. v. F.D.I.C., 62 F.3d 449, 454 (2d Cir. 1995) ("a paradigmatic regulatory taking occurs when a change in the law results in the immediate impairment of property rights, leaving the property owner no options to avoid the loss"). While the ECWA's Tariff has been amended regularly since Curto initiated service, she points to no amendment to the ECWA's Tariff that resulted in the termination of her water service. See Martin v. Town of Simsbury, 505 F. Supp. 3d 116, 132 (D. Conn. 2020), aff'd, 2022 WL 244084 (2d Cir. 2022) ("there was no change in the law that resulted in the impairment of Plaintiff's property rights. Rather, it appears that Plaintiff is simply frustrated by the Defendants' application of existing regulations to his Property when refusing to grant him a variance or approve his permit application").

        Instead, Ms. Curto argues that the termination of her service ran afoul of the Tariff which allowed water service to be terminated for "only one reason, non-payment". Curto's Sur-Reply Memorandum of Law [132] at 25. That is simply not so. See Tariffs effective January 1, 2006 [126-5], §2.33(F) and January 1, 2017 [126-6], §2.32(F) ("[w]ater service may be discontinued by the [ECWA] . . . . [f]or refusal of reasonable access to the property for the purpose of . . . replacing . . . meters").[7]

---

[7]    Ms. Curto also disputes whether a meter change was necessary. See, e.g., Curto Affidavit [121] at 23, response to Claims ¶¶10, 11 ("there is no evidence that the meter needed to be changed"). However, the Tariff gave the ECWA the unfettered "right to remove and test any meters at any time and to substitute another meter in its place". Tariff effective January 1, 2006 [126-5], §6.09. While she relies on

With regard to the third and final factor, "the character of the governmental action", "a 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." Penn Central Transportation Co. v. City of New York, 438 U.S. 104, 124 (1978). There being no conduct that can be characterized as a physical invasion, the ECWA's termination of Ms. Curto's water service pursuant to the terms of the Tariff readily falls into the latter category. For these reasons, and those set forth by the ECWA, I recommend that her takings claim be dismissed.

**D.   Damages**

With respect to Ms. Curto's trespass claim, the ECWA suggests that "if the Court disagrees that the Authority was authorized to enter onto Plaintiff's property, then it should only award Plaintiff nominal damages in the amount of $1". ECWA's Memorandum of Law [113-4] at 26. However, since it has not yet been determined whether the ECWA *did* trespass on Curto's property (Ms. Curto herself has not moved for summary judgment on her claims), an award of damages - nominal or otherwise - would be premature.

"[C]ourts normally decide only questions presented by the parties", United States v. Sineneng-Smith, ___U.S.___, 140 S. Ct. 1575, 1579 (2020), which is all that I have done. That being said, I feel compelled to offer a few additional comments for the parties' benefit. This action has been pending for over four years. Ms. Curto has always had the ability to have her

---

Section 2.40 of the 2006 Tariff (Curto's Sur-Reply Affidavit [132] at 10), it states that "[i]f a customer refuses access to the premises on three . . . consecutive occasions, *the [ECWA] may require the customer to purchase a remote read meter*" ([126-5], §2.40 (emphasis added)). Nowhere does it restrict the ECWA's discretion to undertake a meter replacement.

water service restored by allowing the ECWA to replace her water meter. For her own reasons, she has refused the ECWA's offers to do so. If she is expecting a large recovery in the event that she prevails on her remaining claims, I suggest that she think again.

## CONCLUSION

For these reasons, I recommend that the ECWA's motion for summary judgment [113] be granted to the extent that it seeks dismissal of Ms. Curto's takings claim, but otherwise be denied. Unless otherwise ordered by Judge Sinatra, any objections to this Report and Recommendation must be filed with the clerk of this court by December 1, 2022. Any requests for extension of this deadline must be made to Judge Sinatra. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection . . . supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new

arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

Dated: November 14, 2022

/s/Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge

.