1

```
 1                  UNITED STATES DISTRICT COURT

 2                  WESTERN DISTRICT OF NEW YORK

 3
         - - - - - - - - - - - - X        18-CV-0695
 4       PATRICIA J. CURTO,
                     Plaintiff
 5
               Vs.                        Buffalo, New York
 6       ERIE COUNTY WATER AUTHORITY,     October 26, 2022
                     Defendant
 7       - - - - - - - - - - - - X

 8
                     TRANSCRIPT OF ORAL ARGUMENT
 9          BEFORE THE HONORABLE JEREMIAH J. MCCARTHY
                 UNITED STATES MAGISTRATE JUDGE
10

11               PATRICIA J. CURTO
                 20 Hazel Court
12               West Seneca, New York 14224
                 Appearing Pro Se
13
                 GOLDBERG SEGALLA LLP
14               BY: JAMES D. MACRI, ESQ.
                 665 Main Street
15               Suite 400
                 Buffalo, New York 14203
16               Appearing on behalf of the Defendant

17

18

19

20

21

22       COURT REPORTER: Brandi A. Wilkins
                 scalisba@gmail.com
23               Kenneth B. Keating Federal Building
                 100 State Street, Room 2120
24               Rochester, New York 14614

25
```

2

1             THE CLERK:  All rise.

2             THE COURT:  Good afternoon.  Please be

3      seated.

4             THE CLERK:  On the record in civil

5      proceeding 18-CV-695, Curto V Erie County Water

6      Authority for oral argument.  Present in the courtroom

7      are plaintiff Patricia Curto, attorney James Macri for

8      defendant.  The Honorable Jeremiah J. McCarthy

9      presiding.

10             THE COURT:  Um, good afternoon, again.

11             MR. MACRI:  Good afternoon.

12             THE COURT:  And we have the Water

13      Authority's motion for summary judgment which will be

14      argued this afternoon.  Both of you can remain at the

15      table if you wish or you can come up to the podium,

16      whichever you prefer.  Okay?  And I have reviewed the

17      papers carefully and I will be reviewing them again,

18      but with that, um, I'll hear from both of you.

19             MR. MACRI:  Good afternoon, Your Honor.

20      James Macri Goldberg Segalla on behalf of defendant

21      Erie County Water Authority.  May it please the Court,

22      this is our motion for summary judgment.  Despite

23      repeated claims of dismissed claims such as

24      discrimination and over charge, as this Court is well

25      aware, this case involves three remaining claims, um,

1    a violation of procedural due process, an alleged

2    taking under the constitution and a trespass under New

3    York State law.

4            As explained in our motion papers -- our

5    moving papers and our reply papers, each of Ms.

6    Curto's claims fail, and in opposition, she failed to

7    raise a triable issue of fact for summary judgment,

8    but in essence, this case boils down to a few key

9    facts.  Pursuant to the Erie County Water Authority

10   act, the Water Authority has granted um a number of

11   powers and rights including the right to enter onto

12   property to inspect, repair and maintain its own

13   equipment.

14           Those rights and more are further granted

15   through the Erie County Water Authority tariff that's

16   been in effect since 1953 and which Ms. Curto

17   expressly agreed to be subject to pursuant to her 2006

18   application for water service.  Um, numerous sections

19   of the tariff provide that the Water Authority has the

20   right to enter onto property to repair or replace

21   water meters specifically which is what is at issue in

22   this case including um for necessary maintenance but

23   also upon its own discretion for things such as

24   upgrades.

25           Here, the upgrade um in question was

1    something called an upgrade to e-coder technology

2    which the authority began using in approximately 2007

3    um which allows the authority to take readings from

4    the meter from the street rather than having to enter

5    onto the property and go to a port on the side of the

6    home to take a meter -- a reading, sorry, from the

7    meter which in this case is located in the basement

8    but inside the dwelling.

9           Throughout um 2014, '15 and '16, um, the

10   Water Authority provided numerous notices, eight

11   letters to be exact, six of which provided that water

12   service could be terminated and three of which were

13   actually sent by certified mail.

14          THE COURT:  None of those letters -- correct

15   me if I'm wrong, but other than the final notice that

16   was left on March 1 of 2017, none of those letters

17   said that the Water Authority would terminate service.

18   They only said that it could terminate service.

19   Right?

20          MR. MACRI:  Um.

21          THE COURT:  The only notice that said that

22   the authority would terminate service was the March 1

23   notice.  It says failure to hear from you in ten days

24   will result in the termination of water service.

25          MR. MACRI:  Um.

1           THE COURT:  Correct?

2           MR. MACRI:  The letters referred to the

3   section of the tariff um one section, and forgive me I

4   don't know the date of the specific number, but that

5   section of the tariff specifies that a failure to

6   allow a change of the water meter can result in water

7   service --

8           THE COURT:  Can result.

9           MR. MACRI:  Correct.

10          THE COURT:  But not necessarily that it

11  will.  I mean, in terms of procedural due process and

12  do you agree that the procedural due process, um,

13  requires that the person be given adequate notice

14  prior to termination.  What happens after termination

15  is not relevant to the procedural due process claim.

16  Is that correct?

17          MR. MACRI:  Well, what happens after the

18  termination would be relevant to something like

19  damages or --

20          THE COURT:  Well, it might be relevant to

21  damages, but it's not relevant to whether or not there

22  was a procedural due process violation; isn't that

23  right?

24          MR. MACRI:  Um, yes.  What happens after the

25  termination, yes; um, however --

1              THE COURT:  It might -- it might limit the

2       damages, but it wouldn't undo the fact that if the pre

3       termination notice is not sufficient, there's a

4       violation; correct?

5              MR. MACRI:  Um, that would be correct.

6              THE COURT:  Okay.

7              MR. MACRI:  However, it's the Water

8       Authority's position that each of those notices

9       including the in person discussions that Ms. Curto had

10      at the Water Authority offices prior to termination

11      were sufficient to inform her.

12             THE COURT:  But these notices and

13      discussions um went on for three years, I think.  The

14      first notice being sent in 2014 and then 2015 and 2016

15      and then the final notice so I mean maybe they could

16      have acted earlier but they didn't and I'm focussing

17      only now on was the notice that Ms. Curto received um

18      a proper um notice for purposes of procedural due

19      process, and as you know, um, Judge Feldman --

20      although that was on a motion to dismiss for failure

21      to state a claim, but he -- he expressed some serious

22      doubt as to whether that last notice was sufficient or

23      whether any of the notices were sufficient, and I

24      guess that's my concern even though this is now a

25      motion for summary judgment.

1          MR. MACRI:  The prior notices were not

2     before Judge Feldman at that point in time since it

3     was only a motion to dismiss.  It was just the door

4     tag notice.  The conversations that happened in

5     person, the notices by mail did not -- were not

6     addressed on that motion.  Um, however, it's my

7     understanding that the initial -- after the initial

8     set of letters termination did not occur because there

9     was a difficulty locating the curb box hence why they

10    started the process again.

11          THE COURT:  Uh-huh.

12          MR. MACRI:  And of course, it's not the

13    Water Authority's intention to terminate water service

14    and to give everyone a chance to address this, hence

15    why they sent multiple notices and letters in attempt

16    to get access to the property to allow the change the

17    water heater.

18          THE COURT:  Okay.  Well, let's focus for a

19    minute though on the -- the notice pursuant to which

20    service was terminated and that's the March 1 notice,

21    March 1, 2017.  Right?  Because that said if you don't

22    contact -- failure to hear from you in ten days will

23    result in termination of water service, and the

24    service, that notice was left on her -- at her

25    property on either March 1 or March 2.  I think March

1    1, and the service was terminated on March 21.  So --

2                MR. MACRI:  Well --

3                THE COURT:  -- how does that notice -- and

4    your employee, you know, candidly admitted that he

5    made a mistake when he checked the box application for

6    service, but how is she supposed to know from that

7    notice um that they want to come in and change her

8    water meter?

9                MR. MACRI:  Well, admittedly, the term

10   service has multiple descriptions including such as

11   maintenance and things like that, but Ms. Curto did

12   not respond or call in response to that notice, but

13   I'd also actually like to refer back to the letter

14   notices that were provided, and it in fact does say if

15   you do not contact, we will take steps to discontinue

16   your water service.  The may discontinue is just the

17   language used.

18               THE COURT:  Yeah, but they didn't.  They

19   didn't.  They didn't take steps until the last notice

20   was served and then they um -- then they did.

21               MR. MACRI:  I -- the -- I mean, it's the

22   authority's position that they did take steps.  They

23   sent these multiple letters.  They went to the

24   property to hang that tag notice.  They attempted to

25   contact her in person at the property.  They discussed

9

1    it with her in person at the Authority Office.  Um,

2    those are all steps that they took prior to

3    terminating and providing notice of potential

4    termination and that they would in fact will

5    discontinue.

6            THE COURT:  Okay.  All right.  Um, anything

7    else on the procedural due process issue?

8            MR. MACRI:  If you can give me one second

9    just to flip through here.  Just I guess to address

10   some points that were raised in Ms. Curto's papers,

11   there's essentially two points that she makes.  Um,

12   one that the evidence that the authority has presented

13   is fabricated, um, however, there's been no -- no

14   evidence of that in this matter, and the only thing we

15   have that to base it on is Ms. Curto's statement, and

16   it would require the Court to accept that um multiple

17   attorney -- multiple employees of the authority as

18   well as their attorneys have engaged in a scene to

19   fabricate evidence for this matter.  Um, but also, she

20   makes a statement that all of the prior notices and

21   everything indicate that water service can be

22   terminated are irrelevant and that some supplementary

23   new further notice would be required by law.  All

24   that's required under the due process is that some

25   minimum notice be provided prior to the loss of a

1    right or deprivation of a right, and as I noted, it's

2    our position that all of the letters, the in person

3    conversation and the door tag provide that notice.

4              THE COURT:  Okay.

5              MR. MACRI:  But that's all on that.

6              THE COURT:  Okay.  Let me um -- and you can

7    sit down and you can come back when we talk about the

8    other claims but for now I want to then hear from Ms.

9    Curto just on the procedural due process claim.  Ms.

10   Curto?  And you can -- yeah.  You can remain at

11   your -- at the table there.

12             MS. CURTO:  The um letters that were sent um

13   were certified mail, and according to their records,

14   they were returned.  So I did not receive them.

15             THE COURT:  Are you saying you, um -- are

16   you saying that you did not receive any of those

17   letters?

18             MS. CURTO:  I received, um, I believe two.

19             THE COURT:  Which ones did you receive?

20             MS. CURTO:  Um, I -- unfortunately, I -- I

21   didn't um keep them because the first letter um was I

22   believe in 2014 or 2015 and I went in and I um -- I'm

23   sorry.  The first time um I talked to a person on the

24   phone, second time I went in, and both of those times

25   I thought the letter had been resolved, um, and there

1   was a record where they in fact withdrew the meter

2   change.

3          Um, as to the credibility, um, there is

4   um -- there is just a lot.  Anyways, um, their

5   document 3 which is a meter service order and is dated

6   in 1993.  And in that um meter service order, they

7   have included um that there was a actual reading on um

8   March 21 of 2017, um, March -- I mean, yeah, March 1,

9   2017, March 21, 2017, and one, two, three -- five

10  entries, four from 2017 and one from 2016, and this is

11  dated um February of 1993.  They would have to be able

12  to see into the future and know that these things were

13  happening.  Um, it's just their records are just

14  bizarre.

15         THE COURT:  Well, let me just ask you,

16  ma'am.  When you -- you did see the March 1, 2017,

17  notice that was left on your door; right?

18         MS. CURTO:  Yes.

19         THE COURT:  Okay.  What did you think that

20  meant?

21         MS. CURTO:  I thought it was another um

22  funky mistake.  It said that there was an application

23  for service.  I had interpreted that as meaning um

24  that they had received an application for service from

25  someone else because my application for service was

1    approved I think in 27, um, and I had previously been

2    told twice that they would not talk to me about

3    someone else's um account.

4            THE COURT:  Okay.  No, and the notice you

5    got, that March 1, 2017 notice, that didn't have your

6    address on it, did it?

7            MS. CURTO:  It didn't have my name, my

8    address, my account number, um, had no identifying

9    information.  The um -- I received it on the second.

10   Um, there's -- I say he was there on the second.  He

11   says he was there on the second, but all their records

12   which are incorrect says that he was there on the

13   first.  Um, I --

14           THE COURT:  Okay.  But in any event, when

15   you got that, you didn't think it related to you --

16           MS. CURTO:  No.

17           THE COURT:  -- because it talked about an

18   application for service and didn't have your name or

19   your address on it; right?

20           MS. CURTO:  No, no.  There was no

21   identifying information.

22           THE COURT:  Okay.

23           MS. CURTO:  Um.

24           THE COURT:  And so it wasn't until your

25   service was cutoff on March --

```
 1              MS. CURTO:  21st.
 2              THE COURT:  -- 21st.
 3              MS. CURTO:  Right.
 4              THE COURT:  The next day you went into the
 5    Water Authority; right?
 6              MS. CURTO:  That's correct.
 7              THE COURT:  And what did you say to them and
 8    what did they say to you?
 9              MS. CURTO:  I showed the um receptionist the
10    um green cardboard thing that was hanging from my door
11    knob.
12              THE COURT:  Yeah.
13              MS. CURTO:  And said that um my water
14    service was um illegally terminated, wrongfully
15    terminated and the um -- there is no new customer.
16    I'm the owner.  You know, does this belong on somebody
17    else's door knob?  I don't know.  I said but at this
18    point I want my water restored either today and no
19    later than tomorrow.
20              THE COURT:  Uh-huh.
21              MS. CURTO:  Um, I can't say for sure, um,
22    but I believe -- and I left immediately.  I believe
23    she called either security or the police.
24              THE COURT:  I'm sorry.  She called you what?
25              MS. CURTO:  She called either the security
```

1    guard --

2              THE COURT:  Oh.

3              MS. CURTO:  -- or the police man.  She was

4    on the -- after I made my demand, and I don't think I

5    was beligerent or anything, but I was a little angry

6    because I was without water and I wanted it back and I

7    wanted it back now, and I thought this cardboard thing

8    that was hanging on my door was just a bunch of --

9    another, you know, pretext.  So she got on the phone,

10   and from what I could overhear, she was saying that I

11   wouldn't leave and that she wanted someone to remove

12   me or something to that effect.  So I just -- I left.

13   I didn't want any problem.  You know?  I -- I heard

14   enough of the conversation.  Like I said, I don't know

15   if she was calling the building security, if she was

16   calling Buffalo Police or what, but it didn't matter

17   because I came there for one thing and that was to um

18   demand that my water be restored.  Um --

19             THE COURT:  Okay.  Okay.  Thank you.

20             MS. CURTO:  And you know, they -- at that

21   point, I thought they had made -- there was negligence

22   on their part that they had not -- maybe I thought

23   they had gotten an application and they had somehow

24   mis, you know, interpreted or they didn't verify it or

25   there are other 20 Hazels in this area.  I do get mail

1  from -- mine is 20 Hazel Court.  There's a 20 Hazel

2  Road.  There's a 20 Hazel something else.  So I didn't

3  know but I did know that mine was -- I said illegally,

4  I'm sure, terminated.  And I left.

5          THE COURT:  All right.  Thank you.  All

6  right.  Um, let's talk about the trespass claim, Mr.

7  Macri, and then Ms. Curto, I'll hear from you.

8          MR. MACRI:  With regard to the trespass

9  claim, Your Honor, as I mentioned earlier, there's two

10 sources of the authority's power at issue in this

11 case, the Erie County Water Authority Act and the

12 tariff.  As we discussed, the tariff was consented to

13 by Ms. Curto when she filed her application in 2006

14 where she agreed to be served subject to the terms of

15 the tariff as the same may be changed from time to

16 time.

17          Throughout the entirety of her service from

18 the Water Authority dating back to 1953 -- or 1957,

19 sorry, the tariff has always provided that the um

20 authority and its employees may enter onto the

21 property for the purpose of maintaining and inspecting

22 the -- its equipment to make sure that the water

23 service, equipment, pipes, everything like that

24 function for the benefit of the entire county of Erie

25 County.

1          THE COURT:  But does that apply after

2    service has been terminated?

3          MR. MACRI:  Well, if she had been demanding

4    that service be restored, it would be our position

5    that, yes, she was thought to comply with those terms,

6    but even if that did not apply, there's still the Erie

7    County Water Authority Act which by statute says that

8    the authority can enter onto private lands again for

9    the purpose of inspecting and maintaining its

10   equipment.

11         THE COURT:  Okay.  Um --

12         MR. MACRI:  And -- oh, sorry.

13         THE COURT:  Oh.  I mean, that's your

14   argument; right?

15         MR. MACRI:  That's the argument that the

16   entrances onto the property were with consent and/or

17   authorization by statute.  Um, the other argument that

18   is outlined in our papers and then to which we did not

19   receive any reply is there's been no proof submitted

20   of any damages that might have incurred as a result of

21   this.

22         THE COURT:  Okay.  Thank you.  Um, Ms.

23   Curto, what about the trespass claim?  Don't they have

24   the right to come on the property to check their

25   equipment?

1          MS. CURTO:  The um -- that's -- that's not

2    what they did.  Um, on the second one they came, they

3    hung the notice, they um walked across my property,

4    um, then they came back.  They exited my property.

5    They talked to a neighbor.  They came back onto the

6    property, and this is after they had left the notice

7    and then they left again.  Um, on the 21st when they

8    terminated my service, um, he came onto my property

9    for um a few minutes.  He left for a few minutes.  He

10   came back for a few minutes.

11          THE COURT:  Well, no, but you weren't there

12   that day.  Right?

13          MS. CURTO:  No.

14          THE COURT:  So what's the source?

15          MS. CURTO:  No.  I was there.  In fact, I

16   video taped it with my cell phone through the window.

17          THE COURT:  We don't have the video tapes;

18   right?

19          MS. CURTO:  Um, it's on my old cell phone.

20   I can't get it off.

21          THE COURT:  All right.

22          MS. CURTO:  And your guards won't let me

23   bring a cell phone in.  Um, the March 2 incident where

24   he came onto my property, um, and hung the notice on

25   my inner door after he opened the storm door and was

1    walking all over and then left and then came back was

2    on my um surveillance camera which is um also on my

3    old cell phone.  Um --

4         THE COURT:  Okay.  So I take it your

5    position is that he stayed longer than he should have.

6    Right?

7         MS. CURTO:  Well, he left and then there was

8    -- when he entered again, that's another trespass.

9    Also, on um I think it's -- I think it was September,

10   he came onto my property for the purpose to determine

11   if my house was vacant.  Um, that's what their papers

12   say.  Um, he came onto the property.  He didn't um

13   check to see if it was -- the valve was still off.  He

14   didn't check any meter readings or anything.  Um, he

15   walked in my backyard, um, and then he reported back

16   that it appeared to be, um, vacant.  It's not his job

17   to determine if my house is vacant.  Um --

18        THE COURT:  Okay.  All right.

19        MS. CURTO:  Additionally, after he checked

20   the valve at the street that it was off, he should

21   have left, but no.  He kept coming on and checking the

22   exterior port which he claimed um -- on March 31, he

23   claimed had been ripped off, but why -- why do you

24   keep coming back, you know, week after week, month

25   after month and keep checking and keep reporting that

1    it's been ripped off.

2           But coincidentally in 2018, he took a

3    reading, a meter reading.  How can you know if it's in

4    fact torn off.  I also accused in my paper that he

5    tore it off.  He didn't deny it.  So there's -- the

6    injury -- the injury I believe is the mere presence of

7    them being on my property.  There's no -- if they had

8    a legitimate reason, they have no legitimate reason.

9    My service is off.  It's off at the curb.

10          After you check the curb box, they said that

11   I could have bought some special tool and had it

12   turned back on.  That's not -- that's not probable

13   cause.  You know?  If you say I did buy the tool and

14   therefore I have to check the box to make sure you

15   didn't use it, but no.  I didn't buy no tool to um

16   turn it back on.  They had no reason to be checking.

17   There was -- I mean --

18          THE COURT:  Okay.  All right.  I have your

19   position.  All right, Mr. Macri.  How about the

20   takings claim?

21          MR. MACRI:  Thank you, Your Honor.  For the

22   takings claim, there's a number of reasons why the

23   claim fails.  I don't want to bore the Court by

24   reiterating anything in our papers, but I will

25   highlight some of the summaries and none of which has

1    been responded to by Ms. Curto's reply or sur reply.

2         First, it's the authority's position that

3    the termination was of Ms. Curto's own cause because

4    of the failure to respond to the various notices, um,

5    but the reason for the impetous of the takings claim

6    was a finding by Judge Scott on the motion to dismiss

7    stage based on a statement that it was illegal to live

8    in the property.  There's been no evidence produced

9    other than that one conclusory statement that it is

10   illegal to live there, um, and even if the lack of

11   municipal water could cause it to be illegal, there's

12   other sources of water that she could have employed.

13        In addition, to show a taking, you have to

14   show that the land was used for a public purpose, um,

15   and the authority admits that other than its pipes,

16   meters, um, reading material or reading equipment and

17   things like that that are on the property, the curb

18   box for example, it has no ownership interest in the

19   property.  Those are all basically underlying the

20   property, and it hasn't taken anything or used it for

21   any public purpose.

22        Um, last, there has to be -- in this case,

23   it would have to be a showing of a regulatory taking.

24   Um, there's no claim or proof that there's been any

25   kind of occupation by the authority or actual physical

1   taking of possession of the land, um, and to show a

2   regulatory taking, there's three factors that are

3   considered by the Court none of which are met here.

4   Um, the first um is that all economic loss -- or all

5   economic use of the property needs to be lost.  It's

6   not just that the best or the preferred use of the

7   property is lost.  So even if it were illegal to live

8   in the property which again we are not conceding but

9   if it were that does not mean that all economic loss

10  of the property is used.  There is various other

11  purposes the property could be used -- the property

12  could be used for, and in addition, it would be a

13  temporary loss of use because once the meter is

14  replaced water service can be restored.

15          The two other factors are there must be a

16  change in some sort of regulatory scene upon which the

17  plaintiff relied.  There's been no showing of that

18  either because the regulatory scheme that was in

19  effect here would be the tariff and the Water

20  Authority Act, both of which have been consistent

21  throughout the period of service of water service to

22  Ms. Curto's property.

23          And then the last is whether it um the act

24  was -- the act that was taken was pursuant to some

25  sort of comprehensive rule that balances the public

1    benefits, and again, it's our position that the tariff

2    um is exactly that.  It's a comprehensive set of rules

3    that ensures that the water um service for the county

4    is operating efficiently, properly, safely so that all

5    residents of the county can use it at their discretion

6    subject to the terms of the tariff, of course.  Um,

7    given that that's the case, the last factor also does

8    not weigh in favor of the taking.

9            THE COURT:  All right.  Thank you.  Ms.

10   Curto?

11           MS. CURTO:  The health department as well as

12   the building codes prevents um occupancy.  The health

13   department is the more problematic one.  They will not

14   um -- he didn't say what other sources of water, but

15   um, they would not approve um bottled water.  They

16   would not approve um a well if in fact a well was

17   feasible.  Um, they would not um approve, I don't

18   know, a water tank on your property.  If there's

19   municipal water supply, they require that you use it

20   because it's the safest possible source, and without

21   the health department approval, you can't live there.

22           Um, the building code also requires water.

23   The property -- the intended purpose of the property

24   is residential.  I can't reside there.  And according

25   to um my research, if the government denies you the

1    use of your property, that is a taking.  Um, as to um

2    the meter replacement it's -- it's -- when I was in

3    there talking to them in 20 um 16, they um claimed

4    they could not read my meter because they didn't read

5    it in 2014, 2015 or 2016.  The reason was that their

6    meter reader had heard a dog barking inside my house

7    and was too frightened to come onto my property for

8    three years to read the meter, and that's why they

9    were going to terminate my service.

10             I offered to um place the 17-year-old blind

11   poodle in a daycare, doggie daycare for the day if

12   they would tell me when he was going to be there to

13   read the meter, and um, that offer was rejected.  They

14   said that they needed access 24/7 without notice in

15   case there was an emergency which came down to either

16   I have to get rid of my dog and have no dogs or I -- I

17   don't have water service.  Um, I expressed my um

18   disbelief in rather crude terms.  I apologized, um,

19   and I left.

20             The dog has been an issue it appears in 20

21   of their records, and that's just ridiculous.  Um, the

22   elderly poodle has now deceased and I now have two

23   dogs.  Um, one of them is a Beagle the other is a

24   German Shepherd, and um, I'm not giving up my dogs to

25   um -- and I should not have to.  Other people have

24

1    dogs.  That's not a problem.  I think it's just

2    another pretext to deny me um water.  It's just

3    ridiculous.

4            THE COURT:  All right.  Um, I have your

5    positions.  I'm going to take another look at the

6    papers.  I will get a recommendation out as to these

7    three remaining claims as to whether they should be

8    dismissed or proceed to trial, and um, whatever I

9    recommend obviously will be subject to further review

10   by Mr. Judge Sinatra, but let me just say for

11   everybody's benefit that um if any claims do survive,

12   and I say this with all respect, I don't think they

13   have very significant monetary value, and I think the

14   case should be settled.  But having said that, I will

15   leave it to the parties as to whether you wish to

16   settle the case or not.  Thank you.

17           MR. MACRI:  Thank you.

18           (Proceeding concluded at 2:38 p.m.)

19

20

21

22

23

24

25

1          **<u>CERTIFICATE OF COURT REPORTER</u>**

2

3          I certify that this is a true and accurate

4   record of proceedings in the United States District

5   Court for the Western District of New York before the

6   Honorable Jeremiah J. McCarthy on October 26, 2022.

7

8   <u>S/ Brandi A. Wilkins</u>

9   Brandi A. Wilkins

10  Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25